## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Danica Petty, et al.,

                    Plaintiffs,        Case No. 21-cv-11328

v.                            Judith E. Levy
                                  United States District Judge
Garden City Public Schools, et al.,

                                Mag. Judge Anthony P. Patti
                Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS LIVONIA PUBLIC SCHOOLS AND ANDREA OQUIST'S MOTION FOR SUMMARY JUDGMENT [156]

This case involves disturbing allegations of sexual abuse by James Baird, who was employed to work with students with visual impairments at public schools in Michigan. "School should be a safe, nurturing, and positive environment for [all] children." *Campbell v. Dundee Cmty. Schs.*, No. 12-cv-12327, 2015 WL 4040743, at *1 (E.D. Mich. July 1, 2015) *aff'd* 661 F. App'x 884 (6th Cir. 2016). Plaintiffs allege that the minor children subject to Baird's abuse were denied the school environment they deserve. In addition to asserting claims against Baird, Plaintiffs assert claims against Livonia Public Schools ("LPS"), a school district that hired

Baird and employed him during the alleged abuse, as well as LPS superintendent Andrea Oquist.

Before the Court is Defendants Livonia Public Schools and Andrea Oquist's Motion for Summary Judgment ("the Motion"). (ECF No. 156.) For the reasons set forth below, the Motion is granted with respect to Plaintiffs' claims based on municipal liability, Title IX, and supervisory liability. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims against LPS and Oquist and therefore dismisses them without prejudice.

## I.  Background

This litigation involves several cases that have been consolidated for pretrial purposes only. (ECF Nos. 50, 77.) The consolidated cases include:

- *Danica Petty, as Next Friend of Z.F. Doe v. Livonia Public Schools, Garden City Public Schools, James Baird, Derek Fisher, Andrea Oquist, and James Bohnwagner* (5:21-cv-11328) ("*Petty*");

- *Gabrielle Washington, as Next Friend of P.H. Doe v. Livonia Public Schools, Garden City Public Schools, James Baird, Derek Fisher,*

*Andrea Oquist, and James Bohnwagner* (5:22-cv-12402) ("*Washington*");

- *Sarah Doe, as Next Friend of F.A. Doe v. Livonia Public Schools, Garden City Public Schools, and James Baird* (5:23-cv-10372) ("*Doe*");

- *Amanda Wilhelm, as Next Friend of M.S. Doe v. Livonia Public Schools, James Baird, Andrea Oquist, Wayne Westland Community Schools, John Dignan, Matthew Provost, and Emily Hawthorne* (5:22-cv-10809) ("*Wilhelm*"); and

- *Lona and Kendrick Blank, as Next Friends of K.B. Doe v. Livonia Public Schools, Wayne Westland Community School District, James Baird, Andrea Oquist, Jill Simmons, and Kimberly A. Doman* (5:22-cv-12404) ("*Blank*").

*Id. Petty* is the lead case, and all filings must be made on that case docket. *Id.*

The Court has already granted summary judgment to Garden City Public Schools ("GCPS"), Derek Fisher, James Bohnwagner, Wayne Westland Community School District ("WWCSD"), Jill Simmons, Kimberly Doman, John Dignan, Matthew Provost, and Emily

3

Hawthorne. *Petty v. Garden City Pub. Sch.*, No. 21-cv-11328, 2025 WL 723028 (E.D. Mich. Mar. 6, 2025). Subsequently, two Plaintiffs, Amanda Wilhelm, as next friend of M.S. Doe, and Sarah Doe, as next friend of F.A. Doe settled their cases. (ECF Nos. 197, 200.) Accordingly, this Opinion and Order will not address those settled claims but will consider whether to grant summary judgment with respect to the claims against LPS and LPS Superintendent Oquist in *Petty*, *Washington*, and *Blank*.

The consolidated cases arise out of allegations that Baird sexually abused minor children, all of whom were students with visual impairments. Baird worked as an employee of LPS and was contracted out by agreement to work in GCPS and WWCSD. (ECF No. 40, PageID.462; 22-cv-12404, ECF No. 1, PageID.5.)

Baird previously worked for the Allegan Public Schools ("APS"), starting in 2004. (ECF No. 124-2, PageID.1953.) On August 1, 2007, Baird received a written warning from an administrator regarding "inappropriate, unwelcome comments to a female student" that "crossed the line in regards to an appropriate student-teacher relationship and could be interpreted as sexual harassment." (ECF No. 167-8, PageID.7808.) It admonished him to "be professional at all times" and

4

"[w]hen working with female students in the future, you must be certain to never work alone and always have someone else on-deck or in the vicinity." (*Id.*) A different APS administrator asked Baird if "had asked a student about dating him," which he initially denied "but later admitted to [in part]." (ECF No. 124-2, PageID.1978–1979.)

A March 24, 2010 letter terminating Baird's employment with APS describes "documented incidents of unprofessional conduct involving a minor child, and insubordination." (ECF No. 167-9, PageID.7811.) Baird had been permitted to ride with swim team members to a state swim meet in a limousine. (ECF No. 124-2, PageID.1979.) During the ride, a photographer took photos, including three featuring Baird with a female student. (*Id.*) One included him slouched over with his head on her shoulder, another included them staring at each other, and a third featured them "engaged in a stretching demonstration." (*Id.*)

Baird sued APS over his termination. The Allegan County News requested information about the lawsuit through the Michigan Freedom of Information Act and published an article reporting that Baird settled "out of court" after his termination for "unspecified unprofessional behavior." (*Id.* at PageID.1983.) The article quoted a district official

saying that the matter had "nothing to do with any illegal activity or student safety." (*Id.*) It also noted "one previous undisclosed disciplinary issue . . . approximately two years prior to his dismissal." (*Id.*) The settlement between Baird and APS included an agreement to "expunge" portions of Baird's personnel record, including certain documents related to disciplinary actions, to provide Baird a neutral letter of recommendation, and not to discuss the events related to Baird's termination. (*Id.* at PageID.1953–1954.) The settlement notes that certain documents and other matters related to discipline may be subject to disclosure under state law. (*Id.* at PageID.1954.) At his deposition, a principal from APS testified that he would have shared specifics about Baird's misconduct if someone from another school district had contacted him to inquire about it. (ECF No. 167-7, PageID.7805.)

After being terminated from APS, Baird took a position with Durand Area Schools. However, pursuant to a Michigan statute, Mich. Comp. Laws § 380.1230b, Durand Area Schools requested and received documents related to Baird's conduct from APS, after which they terminated Baird. (ECF No. 167-10, PageID.7829–7830; ECF No. 167-11.)

6

In 2013, Baird applied to work for LPS in the job from which he was contracted out to GCPS and WWCSD. (ECF No. 167-3, PageID.7699.) He did not reveal that he had been terminated from positions at APS or Durand Area Schools and stated that he had not been discharged or had an employer request that he resign from a position. (*Id.* at PageID.7700; ECF No. 167-10, PageID.7837, 7843.) There was a multi-year gap in his resume during that period, which ran from 2003 to 2008. (ECF No. 167-4.) He did, however, include that he had been a student teacher in APS in 2003. (ECF No. 167-3, PageID.7703.) Baird also included a more recent position at St. Joseph County Intermediate School District. (*Id.* at PageID.7702.) Pursuant to Mich. Comp. Laws § 380.1230b, LPS requested disclosure of any unprofessional conduct by Baird from St. Joseph County Intermediate School District. (ECF No. 156-21, PageID.6571.) Baird began working at LPS in 2013, during which time he also worked with students in GCPS and WWCSD, including the minor children who Plaintiffs allege Baird abused.

On December 9, 2019, GCPS learned of Z.F. Doe's allegations against Baird, after which GCPS removed Baird from working with

students. (ECF No. 167-15.) GCPS informed LPS of the allegations that same day. (*Id.* at PageID.7961.)

LPS put Baird on paid administrative leave from December 10, 2019 until August 31, 2020. (ECF No. 167-17, PageID.8011 (putting Baird on leave and stating he must "not be on school district premises without an appointment"); ECF No. 167-18, PageID.8013 (approving Baird's return to work).) Baird was allowed to return to work after the district attorney declined to press charges against him. (ECF No. 167-16, PageID.7986, 7988; ECF No. 156-29, PageID.6685.)

After LPS learned of additional allegations, it placed Baird back on paid administrative leave on January 4, 2021. (ECF No. 156-3, PageID.6097; ECF No. 156-31; ECF No. 156-32, PageID.6692.) Baird resigned from LPS in August of 2022. (ECF No. 167-16, PageID.7968.)

Plaintiffs provide reports from proposed expert witnesses Anthony T. Marasco and Prof. Charol Shakeshaft. Marasco, an educational administrator, opines that LPS had a deficient hiring process that enabled Baird to obtain employment with LPS and commit sexual assaults. (ECF No. 167-20, PageID.8046–8048.) He states that LPS could

have done an internet search and discovered the lawsuit Baird filed against APS. (*Id*. at PageID.8048–8049.)

Prof. Shakeshaft is a professor of educational leadership at Virginia Commonwealth University who studies how to prevent sexual abuse in schools. (ECF No. 167-21, PageID.8057.) She reviewed the policies LPS had in place and found a variety of deficiencies with respect to sexual misconduct prevention, hiring, and management of personnel. (*Id*. at PageID.8106, 8114, 8119.)

The Court briefly summarizes each of the five lawsuits below, including *Wilhelm* and *Doe*, which have settled and are therefore no longer at issue in the Motion.

### A.    Washington

Gabrielle Washington ("the *Washington* Plaintiff") brings suit on behalf of her minor daughter, P.H. Doe, who is visually impaired and was supposed to receive services from Baird as a student at Douglas Elementary in GCPS. (No. 22-cv-12402, ECF No. 1, PageID.5.) Baird provided "vision specialty services" sessions to P.H. Doe in a windowless room with the door closed, according to the *Washington* Plaintiff. (*Id*. at PageID.5.) During a session on October 9, 2018, Baird allegedly fondled

P.H. Doe's chest. (*Id.* at PageID.5–6; *see also* ECF No. 167-12, PageID.7897 (P.H. Doe stating in a deposition that Baird touched her chest in a hallway).) On October 16, 2018, during another session, he allegedly placed his penis in P.H. Doe's hand while her eyes were covered with a device called "eye occluders," which obscured her vision. (No. 22-cv-12402, ECF No. 1, PageID.6; *see also* ECF No. 167-12, PageID.7902.) When she expressed her discomfort and took the occluders off, she saw Baird "pulling up and zipping up his pants." (No. 22-cv-12402, ECF No. 1, PageID.6.) P.H. Doe reported the incidents to her mother on December 25, 2020, after which her mother contacted the police. (*Id.* at PageID.7.)

The *Washington* Plaintiff asserts federal-law claims against LPS and Oquist for municipal/supervisory liability. (*Id.* at PageID.19–27.) She also asserts state-law claims against Oquist for gross negligence/willful and wanton misconduct and failure to report child abuse, and she asserts violations of the Elliott-Larsen Civil Rights Act ("ELCRA") against LPS. (*Id.* at PageID.27–30, 36–44.)

## B.   Petty

Danica Petty ("the *Petty* Plaintiff") brings suit on behalf of her minor daughter, Z.F. Doe, who is visually impaired and was supposed to

receive services from Baird as a student at Douglas Elementary in GCPS. (ECF No. 40, PageID.462.) She alleges that Baird sexually assaulted Z.F. Doe at school on December 9, 2019 in a windowless room with the door closed. (*Id.* at PageID.462–463.) That day, Baird allegedly placed eye occluders on Z.F. Doe during the session, after which he "proceeded to place his penis in Z.F. Doe's hand and around her mouth." (*Id.* at PageID.463.) When she expressed her discomfort and took the occluders off, she saw Baird "pulling up and zipping up his pants." (*Id.*)

Z.F. Doe immediately reported what happened to her mother. (*Id.*) That led to a GCPS investigation, after which GCPS no longer permitted Baird to provide services to students. (*Id.* at PageID.463–464.) GCPS informed LPS of Z.F. Doe's allegations on December 9, 2019, but LPS did not terminate Baird, who resigned from LPS in 2022. (*Id.* at PageID.464–465.)

The *Petty* Plaintiff asserts federal-law claims against LPS and Oquist for municipal/supervisory liability. (*Id.* at PageID.477–484.) She also asserts state-law claims against Oquist for gross negligence/willful and wanton misconduct and failure to report child abuse, and violations of ELCRA against LPS. (*Id.* at PageID.484–487, 493–501.)

11

### C.   Doe

Sarah Doe ("the *Doe* Plaintiff") brings suit on behalf of her minor daughter, F.A. Doe, who is visually impaired and was supposed to receive services from Baird as a student at Douglas Elementary in GCPS. (No. 23-cv-10372, ECF No. 1, PageID.11.) She alleges that Baird sexually assaulted F.A. Doe at school in 2019 during what was supposed to be an eye exam. (*Id.* at PageID.10–12.) The alleged assault took place in an empty classroom with the door and windows covered. (*Id.* at PageID.3, 11.) Baird allegedly blindfolded F.A. Doe as part of the purported eye exam, but she was able to see him expose his penis and then put her hand on it. (*Id.* at PageID.11–12.) He then allegedly took F.A. Doe on a walk without signing her out of school and threatened her with punishment if she revealed his conduct. (*Id.* at PageID.12.) F.A. Doe reported the incident in the fall of 2021 to a teacher in a different school district. (*Id.* at PageID.12–13.)

The *Doe* Plaintiff has settled her claims. (23-cv-10372, ECF Nos. 21, 22.)

### D. Wilhelm

Amanda Wilhelm ("the *Wilhelm* Plaintiff") brings suit on behalf of her minor daughter, M.S. Doe, who is visually impaired and was supposed to receive services from Baird as a student at Marshall Upper Elementary in WWCSD. (No. 22-cv-10809, ECF No. 1, PageID.6.) She alleges that Baird sexually assaulted M.S. Doe at school between 2017 and 2019: "Defendant Baird would play a game with M.S. Doe that he called the 'sucker game' and involved oral sex and touching of genitals. It involved the promise of a sucker." (*Id.*)

Despite M.S. Doe reporting Baird's conduct to her teacher, nothing was done. (*Id.* at PageID.6.) M.S. Doe later reported what happened to her mother, as well as the police. (*Id.* at PageID.7.)

The *Wilhelm* Plaintiff has settled her claims. (No. 22-cv-10809, ECF No. 39.)

### E. Blank

Lona and Kendrick Blank ("the *Blank* Plaintiffs") bring suit on behalf of their minor daughter, K.B. Doe, who is visually impaired and was supposed to receive services from Baird as a student at Stevenson Middle School in WWCSD. (No. 22-cv-12404, ECF No. 1, PageID.5–6.)

13

They allege that Baird sexually assaulted K.B. Doe at school in February of 2020 during what was supposed to be an eye exam. (*Id.* at PageID.7.) While alone with K.B. Doe "without any supervision," Baird allegedly "covered K.B. Doe's eyes . . .[,] fondled her, and placed his penis in her hand and her mouth." (*Id.* at PageID.6–7.)

The day of the alleged assault, "K.B. Doe returned to her class and told her teacher, Ms. Joanna Eiwen, that Mr. Baird made her uncomfortable and that she did [not] want to work with Defendant Baird again." (*Id.* at PageID.7.) On February 11, 2022, K.B. Doe reported what happened to her parents. (*Id.* at PageID.7–8.)

The *Blank* Plaintiffs assert federal-law claims for municipal/supervisory liability against LPS and Oquist, and for violation of Title IX of the Education Act of 1972 against LPS. (*Id.* at PageID.20–27, 45–50.) They also assert state-law claims for gross negligence/willful and wanton misconduct and failure to report child abuse against Oquist, and violations of ELCRA against LPS. (*Id.* at PageID.27–30, 36–45.)

## II.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

LPS and Oquist's Motion for Summary Judgment, (ECF No. 156), is fully briefed.[1] (ECF Nos. 167, 182.) LPS and Oquist seeks summary judgment with respect to Plaintiffs' municipal liability and Title IX claims against LPS under federal law, their supervisory liability claims against Oquist under federal law, and their state-law claims against LPS and Oquist. (ECF No. 156, PageID.6040.)

---

[1] The *Wilhelm* and *Doe* Plaintiffs each filed responses to the Motion. (ECF Nos. 165, 166.) Because they have settled, the Court does not consider those responses in this Opinion and Order. Accordingly, when the Court refers to "Plaintiffs" in what follows, it refers to the *Petty*, *Washington*, and *Blank* Plaintiffs unless otherwise specified.

## A.   Municipal Liability Claims Against LPS

LPS seeks summary judgment on Plaintiffs' municipal liability claims brought under 42 U.S.C. § 1983. Plaintiffs argue that LPS is liable for failing to screen Baird from employment, as well as for failing to train or supervise him. (ECF No. 167, PageID.7676.)

### i.   Legal Standard

To bring such claims against a school district, a plaintiff must "establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). It is not enough to demonstrate that a municipality employs someone who has violated a plaintiff's rights. *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

To establish municipal liability under *Monell*, a plaintiff must establish the existence of a policy or custom based on "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a

16

policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Plaintiffs must also demonstrate a "direct causal link" between the policy or custom and "the constitutional deprivation." *Claiborne Cnty.*, 103 F.3d at 508.

When a plaintiff alleges municipal liability based on a failure to act (also known as an "inaction theory" or "theory of inaction"), they must demonstrate:

> (1) the existence of a clear and persistent pattern of sexual abuse by school employees;

> (2) notice or constructive notice on the part of the [s]chool [district];

> (3) the [s]chool [district]'s tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

> (4) that the [s]chool [district]'s custom was the "moving force" or direct causal link in the constitutional deprivation.

*Claiborne Cnty.*, 103 F.3d at 508 (citing *City of Canton v. Harris,* 489 U.S. 378, 388–89 (1989)); *J.H. vs. Williamson Cnty.*, 951 F.3d 709, 723 (6th Cir. 2020).

*ii.  Failure to Screen*

In arguing that LPS is liable for failing to screen Baird properly, Plaintiffs assert that summary judgment cannot be granted, because a "proper investigation" would have revealed that "Baird was disciplined and terminated as a result of unprofessional conduct when employed by" APS. (ECF No. 167, PageID.7677.) They contend that LPS was deliberately indifferent, because they knew the risk of sexual assaults when hiring someone without appropriate vetting. (*Id.* at PageID.7677–7678.)

Without providing any citation, Plaintiffs wrongly assert that they can "satisfy [their] burden by showing that had a proper investigation been done, the evidence that demonstrated the likelihood of a constitutional violation would have been discovered." (*Id.* at PageID.7677.) This misstates the standard for a failure to screen claim. "Simply choosing not to inquire into an applicant's background does not amount to deliberate indifference" that would support a failure to screen claim. *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1039 (6th Cir. 2024). To bring a claim for failure to screen, a plaintiff must show that "a municipal actor disregarded a known or obvious consequence of [its]

18

action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411.

The Supreme Court has held that, to bring a claim based on a failure to screen, a court must make "a finding that *this* [individual] was highly likely to inflict the *particular* injury suffered by the plaintiff." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 412. For instance, "a record of driving infractions" and having "pleaded guilty to various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness" is not enough to make it likely that an officer will violate individuals' constitutional rights by using excessive force against them. *Id.* at 401, 414. In a case where a city deliberately chose not to investigate a prospective hire's background, the Sixth Circuit held there was not a sufficient causal link between concerns about an officer's demeanor and professionalism, failure to complete training, and

19

"predisposition to violence" and holding people at gunpoint during an unconstitutional stop. *Kovalchuk*, 95 F.4th at 1041. By contrast, one court has held that hiring a police officer with a history of "numerous instances of official insubordination, defiance, unlawful arrests, and violations of safety policies" constituted deliberate indifference to the high likelihood he would engage in the fatal use of excessive force. *Thompson v. City of Lebanon*, No. 3:11-cv-00392, 2014 WL 12677063, at *15 (M.D. Tenn. June 10, 2014). However, the Eighth Circuit has commented that "prior complaints in an applicant's background must be nearly identical to the type of [] misconduct that caused the constitutional deprivation allegedly suffered by a plaintiff." *Morris v. Crawford Cnty.*, 299 F.3d 919, 923 (8th Cir. 2002) (collecting cases).

The Court has already held that

> under binding precedent, [Baird's] prior conduct does not rise to the level necessary to establish that [his] alleged sexual abuse of students was a known or obvious consequence of hiring him, such that doing so constituted deliberate indifference to Plaintiffs' rights. It is not enough to show that Baird was a "poor candidate" or that more extensive review would have led to the decision not to hire him. *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 414. Instead, the alleged rights violations must have been a "plainly obvious consequence of the hiring decision." *Id*. While the record of Baird's conduct in Allegan Public Schools is troubling, it does

20

> not include conduct comparable to the pattern of sexual abuse and assault alleged in this litigation. The significant differences between the prior accusations against Baird and the allegations in these lawsuits, in combination with public comments from an Allegan Public Schools administrator denying any threat to student safety, undermines [the] claim that this conduct put [school districts] on notice that there was a high likelihood of the specific constitutional violations alleged here. *Kovalchuk*, 95 F.4th at 1041.

*Petty*, 2025 WL 723028, at *9. Even if LPS's screening and hiring procedures could have been more discerning, the Court's previous ruling precludes Plaintiffs' failure to screen claims. In addition to misstating their burden, Plaintiffs do not justify departing from the Court's prior holding nor do they otherwise establish that LPS is liable for failing to screen Baird adequately.

### iii.    Failure to Train

Plaintiffs also assert that LPS is liable for failing to properly "train and supervise" Baird and its other employees. (ECF No. 167, PageID.7678.) They articulate their claims in terms of training rather than supervision, however. (*Id.*)

To establish municipal liability based on inadequate supervision or training, a plaintiff "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy

21

was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Franklin*, 115 F.4th at 474. To demonstrate deliberate indifference with respect to such claims, a plaintiff must show that the failure to train was either in a situation where the consequences from lack of training were foreseeable or where a municipality failed to address repeated constitutional violations by its employees. *See id.*

Plaintiffs assert that LPS failed to instruct Baird that he should not be alone with a child. (ECF No. 167, PageID.7678 ("[Baird] was never trained that he could not be alone in a one on one setting with a child, which Plaintiffs' experts have opined is improper.").) Plaintiffs do not establish that any failure to train Baird had a direct or close causal relationship to the injury. *See Franklin*, 115 F.4th at 474; *Claiborne Cnty.*, 103 F.3d at 508. Plaintiffs allege that Baird's conduct took place outside LPS, and they do not explain how any lack of training in LPS "was the 'moving force' behind [his] decision to sexually assault a child" in those districts. *J.H.*, 951 F.3d at 724.

Plaintiffs' experts' opinions do not demonstrate that LPS violated the constitution through a failure to train Baird. Their expert, Prof.

22

Shakeshaft, opines that LPS's training was inadequate, but she largely focuses on the importance of training employees to identify and respond to others' misconduct. (*See* ECF No. 167-21, PageID.8122–8123, 8152.) Though she does indicate that private one-on-one interactions should be prohibited, she does not articulate that opinion in terms of *training* nor does she explain how failing to provide such training in LPS was the causal driving force behind Baird's conduct in other school districts. (*Id.* at PageID.8096 ("Policies should also prohibit being alone with a child especially in an obscured or private space.").) Plaintiffs' expert Marasco, tellingly, focuses on whether policies in GCPS and WWCSD prohibited such one on one interactions—not on whether LPS provided training related to such interactions. (ECF No. 167-20, PageID.8050.) Because a reasonable jury could not find that LPS's failure to train Baird directly caused Plaintiffs' injuries, such a claim cannot provide a basis for municipal liability.

Plaintiffs also argue that LPS failed to properly train its employees "on how to screen applicants and identify red flags." (ECF No. 167, PageID.7678.) To the extent that this claim simply restates Plaintiffs' failure to screen claim, that claim fails, as the Court set forth above. The

Court assumes that Plaintiffs therefore intend to assert a separate failure to train claim related to job applicant screening.

To establish that such a failure to train its employees was the result of LPS's deliberate indifference, they must either show that "it was inherently foreseeable" that improper training with respect to screening job applicants would lead to Baird's alleged conduct or that LPS failed to act in response to repeated complaints of violations. *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700–01 (6th Cir. 2006).

The Supreme Court has explained what it takes to show that a rights violation is inherently foreseeable such that a failure to train constitutes deliberate indifference:

> [t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation— that the municipality's indifference led directly to the very consequence that was so predictable.

24

*Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409–10; *see also City of Canton,* 489 U.S. at 390 n.10 (discussing the failure to train armed officers "in the constitutional limitations on the use of deadly force" as a hypothetical example where the need to train is so obvious that the failure constitutes deliberate indifference). The Supreme Court has emphasized that such a claim will only arise in a "narrow range of circumstances." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409.

Although Plaintiffs do not spell out their argument in detail, to meet this standard, there would have to be a high degree of predictability that failing to train LPS employees in how to scrutinize job applications for missing information would lead to sexual assaults. Plaintiffs' expert, Marasco, opines that Baird's hiring was "grossly deficient" due to "the lack of policies, practices, and customs at LPS regarding the hiring process and implementation thereof. The failure to standardize the hiring process reflects a lack of concern for student safety." (ECF No. 167-20, PageID.8048.) Prof. Shakeshaft reaches a similar conclusion, opining that LPS lacks written polices about hiring procedures for "screening, interviewing, and selecting candidates, including attention to student safety and prohibited sexual conduct . . . in operational detail." (ECF No.

25

167-21, PageID.8103; *see also id.* at PageID.8115–8116.) She also finds that there is a general lack of written policies for training employees about "educator sexual misconduct." (*Id.* at PageID.8103.) With respect to training, however, she concludes that "LPS training for staff has become more detailed and appropriate," (*id.* at PageID.8125), though elsewhere she states that "[t]he absence of training about the recognition of educator sexual misconduct left students and parents vulnerable to Baird's abuses." (*Id.* at PageID.8141.) Such evidence suggests LPS's policies were lacking in various respects, but Plaintiffs do not cite evidence that establishes that "it was inherently foreseeable that teachers would assault students" due to deficient training with respect to screening job applicants. *Ellis*, 455 F.3d at 701.

Because Plaintiffs do not show the inherent foreseeability of these violations, they must establish that LPS failed to act in response to multiple constitutional violations. *Id.* In *Ellis*, there were ten reports of "corporal punishment," two of which rose to the level of the abuse at issue in that case. *Id.* The Sixth Circuit held that the plaintiff in *Ellis* had not shown deliberate indifference based on this evidence, because the plaintiff did not show how two incidents over the course of two years was

26

"excessive" and therefore sufficed as notice "when the School District operated 127 schools with over 69,000 students." *Id.* Plaintiffs do not cite any evidence that—before Baird was hired—there were multiple constitutional violations of the sort they allege, which would have provided LPS notice that they had to change their training policies related to screening job applicants. They have therefore not established that LPS was deliberately indifferent and cannot bring a failure to train claim against LPS.

Accordingly, Plaintiffs' municipal liability claims against LPS are dismissed.

## B.   Title IX Claim Against LPS

The *Blank* Plaintiffs allege on behalf of K.B. Doe that LPS violated Title IX of the Education Act of 1972, 20 U.S.C. § 1681 *et seq.* (22-cv-12404, ECF No. 1, PageID.45–50.) Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "[A] a school that receives federal funds can be held liable in damages for a teacher's sexual

27

harassment [or abuse] of a student if it is proven that the school had actual notice and exhibited deliberate indifference to the alleged harassment." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022). A plaintiff alleging such a claim must show: "(1) she was sexually harassed [or abused] by a teacher or professor, (2) an official with authority to take corrective action had actual notice of the harassment [or abuse], (3) the school's response was clearly unreasonable, and (4) the school's deliberate indifference caused her to suffer discrimination." *Id.* at 471.

LPS argues that K.B. Doe "cannot establish actual notice and deliberate indifference," so the Court must grant summary judgment on her Title IX claim. (ECF No. 156, PageID.6052.) Because Plaintiffs fail to establish that LPS was deliberately indifferent, summary judgment must be granted with respect to their Title IX claim against LPS.

Plaintiffs argue that LPS had knowledge of the allegations against Baird prior to his alleged abuse of K.B. Doe and did not take appropriate action. (ECF No. 167, PageID.7689.) They assert that "record evidence creates a genuine issue of material fact relating to whether Defendant had actual notice of Baird's abuse of Z.F. prior to the abuse of K.B." (*Id.*)

28

Plaintiffs do not dispute LPS's assertion that the first time it learned of allegations against Baird was December 2019, after Z.F. Doe accused him of sexual assault. (ECF No. 167, PageID.7664, 7667 (Plaintiffs' discussion of the relevant timeline); ECF No. 156, PageID.6037 (LPS's discussion of the relevant timeline); *see also, e.g.*, ECF No. 156-3, PageID.6117; ECF No. 156-19, PageID.6563.) They allege that Baird abused K.B. Doe on February 11, 2020. (ECF No. 167, PageID.7664, 7667; 22-cv-12404, ECF No. 1, PageID.7.)

LPS contends that Plaintiffs cannot establish that there was actual notice, because the record does not support the conclusion that K.B. Doe was abused after LPS received notice of Z.F. Doe's allegations in December 2019. (ECF No. 156, PageID.6053.) Their argument is based on the purported deficiencies of K.B. Doe's testimony. (ECF No. 182, PageID.9535–9536.)

LPS is incorrect that K.B. Doe's deposition fails to establish that the alleged abuse occurred after LPS received actual notice of the allegations against Baird. At summary judgment, when the Court "must accept Plaintiff's evidence as true and draw all reasonable inferences in [their] favor," the Court "may not make credibility determinations nor

29

weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). In K.B. Doe's deposition, she asserted that Baird abused her on February 11 before schools shut down due to COVID in 2020. (ECF No. 156-35, PageID.6735.) She later affirmed that the incident occurred on February 11, 2020. (*Id.* at PageID.6738.) Asked about the date of the incident again, she stated that it was February 11 during her seventh-grade year[2] and she said she was sure of that, because she is "really good at dates." (*Id.* at PageID.6740.) When asked whether Joanna Eiwen, a teacher, was incorrect that K.B. Doe met with Baird in the fall of 2019 rather than in February 2020, K.B. Doe said no, after which the following exchange occurred:

> Q. So is it possible that this actually happened in the fall of your seventh grade year?
>
> A. I don't remember.
>
> Q. I'm sorry?
>
> A. I don't remember.

---

[2] K.B. Doe was in seventh grade in 2019 and 2020. (ECF No. 156-35, PageID.6734.)

(*Id.*) Later in the deposition she reaffirmed that the incident occurred on February 11, 2020. (*Id.* at PageID.6741.)

Drawing all reasonable inferences in Plaintiffs' favor and refraining from any credibility determinations, K.B. Doe's testimony supports the conclusion that she was abused on February 11, 2020—after LPS learned of Z.F. Doe's allegations against Baird.[3] K.B. Doe repeatedly states that February 11, 2020 is when the abuse occurred. The Court cannot discount those repeated affirmations based on a brief hesitation and expression of doubt during her deposition; that is precisely the sort of credibility determination that is the province of the jury. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

It is true that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

---

[3] Plaintiffs also point out that Baird asserted his Fifth Amendment privilege when asked whether he interacted with any students in February 2020. (ECF No. 167-10, PageID.7873.) They argue that a negative inference is permitted based on Baird's refusal to answer questions about his interactions with students. (ECF No. 167, PageID.7669.) Even without Baird's testimony, however, a reasonable jury could conclude the abuse occurred on February 11, 2020, based on K.B. Doe's testimony alone.

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (rejecting a plaintiff's version of the facts, finding that it was clearly contradicted by video evidence). But there is no such blatant contradiction here—nor is there an evidentiary record that "quite clearly contradicts the version of the story told by" Plaintiff. *Id.* at 378.

Defendants point to evidence that Baird was on administrative leave on February 11, 2020—and had been since December 10, 2019—and argue that therefore Baird could not have committed the assault at the time K.B. Doe alleges. LPS sent Baird a letter on December 10, 2019, stating that he was "hereby placed on administrative leave with pay pending further investigation." (ECF No. 156-27, PageID.6665; *see also* ECF No. 156-26, PageID.6662 (affidavit from then-LPS assistant superintendent stating Baird was put on leave in December 2019 and was not permitted to work for LPS while on leave, "including in any other school districts"); ECF No. 156-3, PageID.6096 (Oquist stating in her deposition that Baird was placed on leave on December 10, 2019).) An LPS memo stated that Baird was allowed to return to work on August

31, 2020. (ECF No. 156-30, PageID.6687.) Plaintiffs admit that "[i]t is unclear at this point how Baird was able to see K.B. Doe on February 11, 2020, when, as per testimony of [Oquist], he was placed on paid leave by LPS on December 10, 2019." (ECF No. 167, PageID.7667.) There is no genuine dispute that LPS put Baird on leave in December 2019, and that he was still on leave throughout February 2020 when K.B. Doe alleges she was assaulted. That, however, does not preclude a reasonable jury from determining that—despite being placed on leave—Baird nonetheless went to K.B. Doe's school and abused her on February 11, 2020. He could have disobeyed LPS's directives, or someone could have mistakenly permitted him to return to work before his leave ended. Defendants therefore fail to demonstrate that the timeline of K.B. Doe's story is "blatantly contradicted by the record." *Scott*, 550 U.S. at 380.

However, even if a reasonable jury could conclude, based on K.B. Doe's testimony, that Baird assaulted K.B. Doe on February 11, 2020, while he was on leave, Plaintiffs fail to show that LPS's "deliberate indifference caused her to suffer discrimination." *Wamer*, 27 F.4th at 471. At summary judgment, given the evidence provided by LPS, Plaintiffs must "must—by deposition, answers to interrogatories, affidavits, and

admissions on file—show specific facts that reveal a genuine issue for trial" with respect to the elements of a Title IX claim, including deliberate indifference. *Laster*, 746 F.3d at 726. But Plaintiffs admittedly cannot explain how Baird could have both been on leave and come to work and committed an assault. (ECF No. 167, PageID.7667.) That explanatory gap comes at the crucial point in Plaintiffs' narrative where the record must demonstrate LPS's deliberate indifference and establish that it caused K.B. Doe's injuries. Because Plaintiffs fail to cite evidence that would fill in this gap, they do not establish that there is a genuine dispute with respect to LPS violating Title IX through its deliberate indifference. Accordingly, the Court grants summary judgment with respect to the *Blank* Plaintiffs' Title IX Claim.

### C.   Supervisory Liability Claims Against Oquist

Defendants argue that the Court should grant summary judgment on Plaintiffs' claims of supervisory liability against Oquist, which are brought under 42 U.S.C. § 1983. (ECF No. 156, PageID.6049.) Plaintiffs assert these claims against Oquist in her official and individual capacities. (ECF No. 40, PageID.457; 22-cv-12402, ECF No. 1, PageID.1; 22-cv-12404, ECF No. 1, PageID.1.)

34

To the extent Plaintiffs intend to allege supervisory liability claims against Oquist in her official capacity, "a suit against an official of the state is treated as a suit against the municipality." *Claiborne Cnty.*, 103 F.3d at 509 (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)) (affirming dismissal of official capacity claims in light of the proper dismissal of claims against the relevant municipal entity). Although the Sixth Circuit does not require dismissal of official-capacity claims simply because they are duplicative of claims against municipal entities, *Troutman v. Louisville Metro Dep't of Corr.*, No. 3:16-cv-742, 2018 WL 6413201, at *2–3 (W.D. Ky. Dec. 6, 2018) (discussing Sixth Circuit caselaw), it has "approved the dismissal of official-capacity claims against individual defendants where the government entity is a party and the plaintiff fails to demonstrate that a policy or custom of the defendant government entity played a part in the violation." *Baar v. Jefferson Cnty. Bd. of Educ.*, 476 F. App'x 621, 635 (6th Cir. 2012) (table opinion) (collecting cases). As set forth in the previous sections, Plaintiffs fail to support their claims against LPS, which is where Oquist is superintendent. Accordingly, their official-capacity claims against her are dismissed.

35

The Court turns, then, to Plaintiffs claims against Oquist in her individual capacity. Defendants argue that she was not actively involved in the alleged rights violations and that she is entitled to qualified immunity. (ECF No. 156, PageID.6049–6051.)

Qualified immunity means that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008).

Courts must determine "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Id*. Courts have discretion to analyze the two prongs of the qualified immunity analysis in either order. *Pearson v. Callahan*, 555 U.S. 223, 242–43 (2009). "[I]f the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the [defendant] violated a clearly established constitutional right,

36

dismissal by summary judgment is inappropriate." *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

To be held liable for a constitutional violation, a defendant must have committed the violation through their "own individual actions" and cannot be held liable based on "proximity" to wrongdoing or *respondeat superior*. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020) (citations omitted). Plaintiffs have the burden of demonstrating Defendants are not entitled to qualified immunity. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To bring a supervisory liability claim, a plaintiff must demonstrate that the supervisor was actively involved in the relevant conduct, meaning that "a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)). A supervisor's failure to act—even if they are negligent or reckless—is not sufficient to support a liability claim against them, nor may courts impose liability on a supervisor based on *respondeat superior*. *Id.* A plaintiff seeking to allege supervisory liability must also establish

37

that a supervisor's "execution of [their] job functions" was the cause in fact and proximate cause of the plaintiff's injuries. *Id.* at 762.

There is no evidence of Oquist's personal involvement in any of the alleged conduct or that she executed her job functions in a manner that caused Plaintiffs' injuries. Oquist was never Baird's direct supervisor. (ECF No. 156-25, PageID.6657.) When LPS hired Baird, Oquist was not yet superintendent. (ECF No. 156-9 (Baird's 2013 offer letter to work at LPS); ECF No. 156-3, PageID.6076–6077 (Oquist explaining that she became LPS superintendent in 2015).) Nor do Plaintiffs explain how Oquist was personally involved in the alleged abuse of Z.F. Doe and P.H. Doe, which she learned about after the fact, or the alleged abuse of K.B. Doe, which, as set forth above, occurred after LPS put Baird on leave. (ECF No. 167, PageID.7664 (Plaintiffs' chart summarizing the timing of the alleged abuse and when it was first reported); *see also* ECF No. 156-25, PageID.6657 (Oquist's affidavit stating when she learned of the various allegations against Baird).)

Plaintiffs argue that Oquist "failed to enact proper precautions (in the face of foreseeable risks) where there was no interview process relative to Baird, where LPS employees were not properly trained on how

38

to prevent sexual abuse by educators and where Baird was permitted to be in closed rooms alone with individual students." (ECF No. 167, PageID.7680.) "Supervisory liability is generally limited to times when the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries." *Crawford*, 15 F.4th at 767 (collecting cases). For instance, "where a defendant has knowledge that the methods she has used to address instances of abuse are ineffective, she does not take adequate precautions by simply continuing to use those methods." *Garza*, 972 F.3d at 866. Plaintiffs do not cite evidence that Oquist knew that LPS policies related to interviewing job applicants, abuse prevention training, or allowing one-on-one teacher-student interactions were ineffective at addressing abuse. Plaintiffs also do not establish that she was confronted by obvious, continuing conduct or a "widespread pattern of constitutional violations" to which she was deliberately indifferent by encouraging, participating, authorizing, approving, or knowingly acquiescing in Baird's alleged conduct. *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 440–41 (6th Cir. 2002). Oquist is unlike the defendant in *Garza* who took no action "despite receiving multiple complaints that made her aware of . . . misconduct." 972 F.3d at 869; *see also Troutman v. Louisville Metro*

39

*Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (describing cases involving supervisory liability where defendants were personally responsible for violations in part based on their actual knowledge of institutional failures, as opposed to merely "inadequately perform[ing] their] responsibilities"). Nor do Plaintiffs cite any other evidence specific to Oquist that would otherwise establish her active involvement in the underlying conduct. Plaintiffs therefore fail to establish that Oquist was personally or actively involved in the relevant conduct by Baird. Accordingly, Plaintiffs' supervisory liability claims against Oquist in her individual capacity must be dismissed.

### D.   State-Law Claims Against LPS and Oquist

Given that no federal claims remain against LPS and Oquist, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims against them arising under state law. The Sixth Circuit instructs that "[a] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Burnett v. Griffith*, 33 F.4th 907, 915 (6th Cir. 2022) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014)); *see also* 28 U.S.C. §

1367(c)(3). Accordingly, Plaintiffs' claims arising under state law are dismissed without prejudice.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS summary judgment as to Plaintiffs' municipal liability, Title IX, and supervisory liability claims against LPS and Oquist. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims against LPS and Oquist and dismisses those claims without prejudice.

IT IS SO ORDERED.

Dated: June 17, 2025                    s/Judith E. Levy
Ann Arbor, Michigan                     JUDITH E. LEVY
                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 17, 2025.

                                        s/William Barkholz
                                        WILLIAM BARKHOLZ
                                        Case Manager